¡WALTER J. ROTHSCHILD, Judge.
On February 17, 1998, Fay and Ronald Guillot filed suit against East Jefferson General Hospital (East Jefferson), and others, alleging that Mrs. Guillot suffered a dislocated hip as a result of the negligence of two hospital nursing aides while she was recovering from surgery at East Jefferson. Trial was held on March 28, 2002, and the parties submitted post-trial memoranda after trial. On May 21, 2002, the parties appeared in court for closing arguments and for the trial judge to make her ruling and recite oral reasons for judgment. The trial court ruled in favor of the defendant, East Jefferson, finding that the plaintiffs had not proven that the dislocation of Mrs. Guillot’s hip was caused by the nursing aides, and the plaintiffs’ lawsuit was dismissed. It is from this judgment that the plaintiffs appeal. For the reasons which follow, we affirm.

FACTS

Dr. Santo LoCoco, an orthopedic surgeon, had been treating Mrs. Guillot since 1992 for various problems, including rheumatoid arthritis. In March of 1994, he recommended that Mrs. Guillot undergo a total hip replacement after he determined that she suffered from aseptic necrosis of her right hip. On March 31, 1 s1994, Dr. LoCoco performed the total hip replacement at East Jefferson. Mrs. Guillot testified that while she was recuperating from the surgery, two ladies came into her room to turn her. She stated that they raised her up high and then one of the ladies let go of the pad they were using to move her, and they dropped her. She asserts that she was in severe pain when the nursing aides dropped her and that she continued to have pain after this incident. She also testified that she was not able to do any physical therapy or walk while she was in the hospital. She contends that she did not want Dr. LoCoco to discharge her from the hospital, because she was in severe pain caused by the nursing aides dropping her. Ronald Guillot also testified, and he stated that his wife was dropped while the nursing aides were turning her.
On May 2,1994, Mrs. Guillot returned to Dr. LoCoco’s office. Dr. LoCoco, who testified via his deposition, stated that when Mrs. Guillot walked into his office, he immediately noticed that she had an abnormal gait, and he had an x-ray done. The x-ray revealed that the hip prosthesis had become dislocated. Dr. LoCoco tried to get the hip back into place without surgery, but was unsuccessful. Therefore, he performed another surgery on May 4, 1994 in order to correct the problem.
Jean Bachus was the patient care technician or nursing aide who was caring for Mrs. Guillot on the day of the incident, and Diana Dumas was a patient care technician who Ms. Bachus asked to assist her with Mrs. Guillot. In lieu of live testimony at trial, the parties stipulated that if Ms. Bachus were called to testify, she would testify as follows. Ms. Bachus would state that she and Ms. Dumas were in the process of transferring Ms. Guillot from an orthopedic chair to her bed. Ms. Bachus contends that her hand slipped while they were pulling Mrs. Guillot onto the bed, but Mrs. Guillot was already on the bed at that time and did not make any complaints to *336 her that she was hurting from the transfer. Ms. Dumas states |4that while she was assisting Ms. Bachus in moving Mrs. Guillot, Ms. Bachus’ hand slipped and let go of the sheet. However, Ms. Dumas asserts, just as Ms. Bachus did, that Mrs. Guillot was already on the bed and was not up in the air or dropped. She also states that Mrs. Guillot did not make any complaints to her that she was hurting from the transfer.
The parties stipulated that if Vonda Stamply were called to testify, she would qualify as a nursing expert, and she would state that it is a breach of the standard of care to drop a patient, and that Ms. Ba-chus and Ms. Dumas breached the standard of care when they moved Mrs. Guil-lot.
Dr. LoCoco testified that Mrs. Guillot was always in pain in all parts of her body before and after the first hip surgery. He testified that Mrs. Guillot had told him that within 24 hours of the first hip surgery, the bed dropped about two feet and she had a sudden onset of pain in her hip. He asserts that Mrs. Guillot did not tell him about this incident until after she was admitted to the hospital for the second hip surgery, and she did not tell him that the nursing aides had dropped her. He stated that “she was complaining of pain before the bed dropped, after the bed dropped, and it looked like no dislocated hip that I have ever seen.” He further stated, “It’s very difficult to tell with this patient. She hurts everywhere, everywhere she has pain.”
Dr. LoCoco testified that this was the first time that he had used the particular prosthesis that he placed in Mrs. Guillot. He indicated that he had never seen a hip dislocate the way hers did and that it may have been from the design of the new prosthesis. He testified that the prosthesis has a metal cup which is secured in the patient by screws and a polyethylene snap-in liner is then placed into the metal cup. The liner is wider on one side than the other in order to prevent displacement. He further stated that when he performed the second surgery, all he had to do was take the cup liner out, reverse it 180 degrees, and snap it back in. |s Dr. LoCoco also testified that when he discharged Mrs. Guillot after the first surgery, she was ambulatory and had no specific complaints of hip pain. He stated that Mrs. Guillot likes her pain medication, and he believes that she did not want to be released from the hospital because she wanted to keep taking narcotics.
Dr. David Aiken, an orthopedic surgeon, testified via deposition. Although he testified that a “drop” or even simply “rolling over in bed” could cause a dislocation, Dr. Aiken believed that the placement of the cup in Mrs. Guillot’s hip, particularly the elevation of the cup, was the major cause of Mrs. Guillot’s hip dislocation. However, he testified that he did not believe that Dr. LoCoco breached the standard of care due to the difficulty in placing these types of prostheses into patients. He also stated that the exercises that Mrs. Guillot performed after the first surgery, according to the physical therapy notes, could not have been done if her hip had been dislocated at that time.
The physical therapy records indicate that Mrs. Guillot was able to walk with a walker and do several exercises, though she denies that she was able to walk during her first hospitalization.

DISCUSSION

On appeal, Mr. and Mrs. Guillot assert that the trial court erred in finding medical causation without any supporting expert medical testimony. They further argue that the trial court erred in assigning fault to Dr. LoCoco, because there was *337 no testimony that he breached the standard of care.
A court of appeal may not set aside the findings of the trial court unless they are clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); LaSalle v. Benson Car Co., Inc., 00-1459 (La.App. 5 Cir. 1/30/01), 783 So.2d 404, 408. Under this standard, the issue is whether the trier of facts conclusion was reasonable, not whether it was right or wrong. Stobart v. State, DOTD, 92-1328 (La.4/12/93), 617 So.2d 880, 882. When factual findings are |Rbased on the credibility of witnesses, the manifest error standard demands great deference to the trier of fact’s findings. Schexnayder v. Exxon Pipeline Company, 01-1236 (La.App. 5 Cir. 3/13/02), 815 So.2d 156, 160. The manifest error standard of review applies to all findings of fact, regardless of whether the evidence consists of live witness testimony or written depositions. Darbonne v. Wal-Mart Stores, Inc., et al., 00-551 (La.App. 3 Cir. 11/2/00), 774 So.2d 1022, 1026.
Mrs. Guillot’s testimony was largely unsupported and contradicted by the medical records and the testimony of other witnesses. One such example is that Mrs. Guillot testified that she was unable to walk during the first hospitalization; however, the physical therapy records indicate that she was indeed able to walk with a walker and perform exercises during her physical therapy sessions. Dr. LoCoco testified regarding several incidents reported to him by Mrs. Guillot long after the surgeries, such as an accident at Service Merchandise and a physical altercation during Mardi Gras. However, Mrs. Guillot denied that she was involved in any of these events or that she reported them to Dr. LoCoco.
In her oral reasons for judgment, the trial judge stated that Mrs. Guillot’s testimony was very difficult to follow and internally inconsistent, and she concluded that the testimony of Mrs. Guillot was “utterly incredible” and did not consider it. She further noted, “I have never had a witness so tragically come before me in the altered state probably caused by prescription medication as Mrs. Guillot,” and “I’m not sure that Mrs. Guillot knew what she was talking about that day that she was here for trial.” The trial judge disregarded the testimony of Mrs. Guillot, because she did not believe it was rehable due to her medicated state.
Although Mrs. Guillot claims that she was dropped two feet above her bed, the nursing aides testified that she was already on the bed when Ms. Bachus’ hand slipped and that Mrs. Guillot did not make any complaints at that time. Both Ms. JjBachus and Ms. Dumas testified about the procedure for moving a patient from a chair to a bed and indicated that it does not involve raising the patient two feet or even several inches above the bed. The trial judge indicated that, based on all of the testimony, she believed that Mrs. Guil-lot was dropped an inch or two above her bed when the nursing aides moved her.
The trial judge stated that she found the testimony of Dr. LoCoco to be very candid. She noted that Dr. LoCoco did not notice any evidence of a dislocation of the hip during Mrs. Guillot’s first hospitalization. However, he noticed immediately on May 2, 1994, when she walked into his office, that she was not walking properly and he had an x-ray done. The trial judge noted that Dr. LoCoco testified that Mrs. Guillot is in pain all of the time and has always enjoyed her pain medication. The medical records indicate that Mrs. Guillot was taking pain medication since at least 1992.
The trial judge stated that “the physical therapy notes do not indicate that this hip *338 dislocated as of the beginning of April, because she is walking without that abnormal gait on the multiple days following that.” She concluded as follows:
I find that while there was malpractice, it is more probable than not that the malpractice did not cause the hip dislocation. It is more probable than not that the hip dislocation was caused by an inappropriate placement of the cup liner in the prosthesis used by Dr. LoCoco during his first surgery.
It is undisputed that Mrs. Guillot suffered a hip dislocation. However, it is the plaintiffs burden to establish a causal connection between injuries and an accident by a preponderance of the evidence. Jones v. Rapides General Hospital, 598 So.2d 619, 621-622 (La.App. 3 Cir.1992). The trial judge concluded that the plaintiffs did not meet their burden of proving that the incident with the nursing aides caused Mrs. Guillot’s hip dislocation.
IsAlthough the plaintiffs argue that the trial court erred in finding that the cup was put in backwards by Dr. LoCoco and that this caused the dislocation, Dr. LoCo-co did testify that in order to correct the dislocated prosthesis, he merely reversed the cup lining 180 degrees. Regardless, even if the trial judge had not found that the cause of the dislocation was improper placement of the cup liner, she clearly did not believe that the “drop” by the nursing aides caused the dislocation and did not believe that the hip was dislocated prior to Mrs. Guillot’s discharge from the hospital. Therefore, she did not find that the plaintiffs met their burden of proving by a preponderance of the evidence that the negligence of the East Jefferson employees caused Mrs. Guillot’s hip to dislocate. The testimony and evidence indicates that this finding by the trial judge is reasonable, and therefore, this court may not disturb it on appeal.
Accordingly, considering the record before us, we find that the trial judge was not manifestly erroneous or clearly wrong when she found in favor of the defendant and dismissed the plaintiffs’ lawsuit. Therefore, the judgment of the trial court is affirmed.

AFFIRMED.